RUSSO LAW OFFICES, LLC
BRAD M. RUSSO, ESQ.
633 Belvidere Road
Phillipsburg, NJ 08865
(908) 454-0806
Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| LINDA S. SKELCY, Individually and as General Administrator and Administrator ad Prosequendum of the Estate of James T. Skelcy, | : : : : : | Civil Action No. |
| Plaintiff, | : : | **JURY TRIAL DEMANDED** |
| -vs- | : : | |
| UNITEDHEALTH GROUP, INC; UNITED HEALTHCARE SERVICES, INC; OXFORD HEALTH PLANS, INC.; OXFORD HEALTH PLANS, LLC; OXFORD HEALTH PLANS (NJ), INC.; OXFORD HEALTH INSURANCE; DENISE BEIGHE, M.D., individually and as an employee/agent of Medical Evaluations Specialists, Inc.; MEDICAL EVALUATION SPECIALISTS, INC.; DENNIS SANDOVAL, M.D., individually and as an employee/agent of UnitedHealth Group; and GAIL WILDER, M.D., individually and as an employee/agent of UnitedHealth Group, | : : : : : : : : : : : : : : : : | |
| Defendants. | : | |

**COMPLAINT**

The Plaintiff, Linda Skelcy, individually and as general administrator and administrator ad

prosequendum of the Estate of James T. Skelcy by way of complaint against the Defendants

says:

**Preliminary Statement**

1.      The Plaintiff brings this action to recover damages for the wrongful denial and delay of health insurance benefits which deprived proper and timely treatment of James T. Skelcy's medical condition, causing his death.

**The Parties**

2.      Plaintiff is an intestate estate in probate in the State of New Jersey, County of Union, Probate part, with letters of general administration and administrator ad prosequendum issued to Linda Skelcy.

3.      The decedent, James T. Skelcy (hereinafter "Mr. Skelcy"), resided at 9 Cayuga Road, Cranford, New Jersey. Mr. Skelcy was self-employed as a geologist and is survived by his wife, Linda, two natural children Jacob and Julia, and two step-children Zachary and Anthony.

4.      Defendant UnitedHealth Group (hereinafter "UnitedHealth"), formerly known as United HealthCare Corporation, is an insurance company incorporated in Delaware with its principal place of business in Minnetonka, Minnesota.  Defendants United HealthCare Services, Inc., Oxford Health Plans, Inc., Oxford Health Plans, LLC, Oxford Health Plans (NJ), Inc. and Oxford Health Insurance (hereinafter collectively "UnitedHealth" or "UnitedHealth Defendants") are wholly owned and controlled subsidiaries of UnitedHealth Group.

5.      UnitedHealth is engaged in transacting the business of insurance in the State of New Jersey within the meaning of N.J.S.A. 17:32-19 and as further evidenced by the agreement of insurance forming the basis to the within suit.

6.     The policy of health insurance involved herein was issued by UnitedHealth, by and through the UnitedHealth Defendants, to the decedent within the State of New Jersey and provided "in-network" coverage within the State of New Jersey.

7.     Defendant Denise Beighe, M.D. (hereinafter "Dr. Beighe") was the medical practitioner providing a "peer review report" reviewing the denial of treatment for Mr. Skelcy in or about July of 2010. Dr. Beighe is licensed to practice in Arizona, with a business address in Tempe, Arizona.  An Affidavit of Merit relevant to this Defendant is attached as "Exhibit A".

8.     Dr. Beighe was assigned Mr. Skelcy's case (MES Case #31810087934) through her agency relationship with Defendant Medical Evaluation Specialists, Inc. (hereinafter "MES Solutions").  At all relevant times herein, Dr. Beighe's actions and inactions in this mater were under the assignment, direction, agency and control of MES Solutions.

9.     Defendant MES Solutions is incorporated in Michigan, with a principal place of business in Atlanta, Georgia.

10.    Defendant Dennis Sandoval, M.D. (hereinafter "Dr. Sandoval") is a licensed ophthalmologist with a practice in Albuquerque, New Mexico. Dr. Sandoval was the Medical Director assigned by UnitedHealth to review the prescription for treatment issued by Mr. Skelcy's treating rheumatologist in or about July of 2010. An Affidavit of Merit relevant to this Defendant is attached as "Exhibit B".

11.    At all relevant times herein, Dr. Sandoval's actions and omissions in this matter were in the scope of his employment/agency relationship with UnitedHealth.

12.    Defendant Gail Wilder, M.D. (hereinafter "Dr. Wilder) is a medical doctor employed by Defendant UnitedHealth and was tasked with oversight and review of the

prescription for treatment issued by Mr. Skelcy's treating rheumatologist in or about July of 2010.  Dr. Wilder has a business address in Purchase, New York. An Affidavit of Merit relevant to this Defendant is attached as "Exhibit B".

13.   At all relevant times herein, Dr. Wilder's actions and omissions in this matter were in the scope of her employment/agency relationship with UnitedHealth.

## Statement of Jurisdiction

14.   As an insurance company formed under the authority of a foreign state within the meaning of N.J.S.A. 17:32-1, UnitedHealth is required to be admitted to conduct the business of insurance in this State pursuant to N.J.S.A. 17:32-2.  The express language of N.J.S.A. 17:32-2(c), and the common law interpretation thereof, specifically establishes, as a matter of legislative policy, that foreign insurance companies must submit to this State's jurisdiction in "any action or legal proceeding."

15.   This Court has jurisdiction over all counts in this matter pursuant to 28 U.S.C. §1332.

16.   UnitedHealth's main office location in New Jersey is 131 Morristown Road, Basking Ridge, County of Somerset, State of New Jersey.

17.   Venue is proper in the Trenton vicinage and judicial district pursuant to 28 U.S.C. §1391 (a) & (c).

## Background Facts Common to All Counts

18.   At all times relevant herein, James T. Skelcy was covered by the health insurance policy of coverage provided by UnitedHealth.

19.    The health coverage was designated by UnitedHealth as a "New Jersey individual PPO Plan C", in which Mr. Skelcy was assigned a member code of 987821502.

20.    The health insurance plan at issue was designated as a preferred provider organization ("PPO") plan.

21.    The health insurance plan at issue is considered an individual health insurance policy in which the insurer has reserved the right to change the premium.

22.    The health insurance plan at issue is not within the purview or scope of the Employee Retirement Income Security Act (ERISA) as specified in Title 29 of the United States Code.

**Initial Diagnosis and Treatment of Mr. Skelcy's Condition**

23.    In or about July of 2007, James Skelcy was diagnosed with Dermatomyositis, a connective-tissue disease that is characterized by skin and muscle inflammation.

24.    Mr. Skelcy was diagnosed with interstitial lung disease (hereinafter "ILD"), a common manifestation in myositis patients, as a secondary condition.

25.    Contemporaneous with Mr. Skelcy's diagnosis of dermatomyositis and ILD, his treating rheumatologist prescribed prednisone, ordered monthly lab tests and conducted monthly evaluations to monitor Mr. Skelcy's condition.

26.    In or about November 2007, the treating rheumatologist recommended and began administering immunosuppressive agents, to wean Mr. Skelcy from the steroid treatments.

27.    Immunosuppressive agents such as Imuran and Methotrexate are reasonable and appropriate "steroid-sparing agents" and are considered common first-line treatments for dermatomyositis and ILD.

28.    In or about November 2007, the treating rheumatologist prescribed Imuran, which ultimately provided no relief to Mr. Skelcy's condition or symptomology.

29.    In or about January 2008, the treating rheumatologist prescribed Methotrexate, which ultimately provided no relief to Mr. Skelcy's condition or symptomology.

30.    Mr. Skelcy was treated with a combination of prednisone and methotrexate for approximately one and one-half years until it was conclusively determined that his dermatomyositis and underlying ILD was resistant to first-line therapies.

### Rituxan Treatment and Remission

31.    In the wake of Mr. Skelcy's condition being resistant to common first-line treatments, the treating rheumatologist prescribed Rituximab (hereinafter "Rituxan"), a common second-line therapy, in or about August of 2009.

32.    Rituxan is a treatment that is approved by the Food and Drug Administration of the United States of America for use in the United States, and it is not uncommon to use it off-label for the refractory condition and symptomology presented by Mr. Skelcy.

33.    Rituxan has shown a positive response in controlling dermatomyositis when administered to refractory patients and re-administered as needed for maintenance.

34.    Mr. Skelcy received two doses of Rituxan each separated by two weeks, on or about the 24th of August, 2009, and on or about September 8th, 2009.

35.    UnitedHealth approved and covered both treatments without delay or issue.

- 6 -

36.    For the first time since diagnosis, Mr. Skelcy was able to enjoy life and remain free of the majority of the symptomology surrounding his otherwise resistant condition.

37.    Mr. Skelcy's treating rheumatologist took note of his exceedingly good response to Rituxan, which was also confirmed by the relevant laboratory tests.  Mr. Skelcy's dermatomyositis and ILD achieved remission and the Rituxan therapy was considered highly successful.

38.    Mr. Skelcy maintained remission in the wake of the Rituxan treatment for almost one full year without additional medical intervention.

39.    Mr. Skelcy was working full days as a geologist and walking nine miles for exercise without fatigue, weakness or shortness of breath.

40.    Approximately eleven months after his Rituxan treatment, in or about July 2010, the treating rheumatologist noted a return of underlying symptomology in Mr. Skelcy's dermatoyositis and ILD.

41.    Accordingly, the rheumatologist immediately prescribed another dose of Rituxan as is standard with the use of this treatment.

42.    The administration of Rituxan for Mr. Skelcy was scheduled for July 14, 2010 at Overlook Hospital in Summit, New Jersey.

**Denial of Treatment**

43.    The treating rheumatologist was unable to get approval for the treatment via Defendant's precertification process on July 12, 2010, just two days prior to Mr. Skelcy's scheduled Rituxan treatment at the hospital.

44.    Instead, on or about the 12th of July, 2010, Defendant requested office notes documenting the medical necessity of the Rituxan treatment, despite having covered the treatment, without delay, less than one year prior.

45.    On or about the 13th of July, 2010, the treating rheumatologist faxed a letter of medical necessity to Oxford with the word "STAT" written on it.  The letter expressed that Mr. Skelcy was scheduled to receive "Rituximab at Overlook Hospital outpatient schedule 7-14-10", which was the following day. The letter further stated "PT has Dermatomyositis treated w/ Methotrexate, Prednisone and Imuran in the past w/out success. Pt had Rituximab in 8/2009 with complete resolution of symptoms (please note pt have interstitial lung disease 2° to dermatomyositis). Now again enzymes are elevated. pt is starting w/ weakness and SOB (shortness of breath)."

46.    The letter of medical necessity lastly stated, "Pt needs Rituximab or IVIG infusion."

47.    The imminence of the Mr. Skelcy's condition and dangerousness of delaying treatment was conveyed to UnitedHealth, through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention.

48.    The imminent need for treatment was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to UnitedHealth.

49.    The imminent need for treatment was, or should have been immediately apparent to UnitedHealth given Mr. Skelcy's worsening condition as demonstrated

through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth.

50.     The imminent need for treatment was, or should have been immediately apparent to UnitedHealth given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth.

51.    The requested Rituxan treatment was medically necessary given the refractory nature of Mr. Skelcy's condition to first line therapies.

52.    The requested IVIG treatment was medically necessary given the refractory nature of Mr. Skelcy's condition to first line therapies.

53.    The requested Rituxan treatment was medically necessary given the prior approval of UnitedHealth approximately one year prior.

54.    The requested Rituxan treatment was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms.

55.    The requested Rituxan treatment was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns.

56.    The requested Rituxan treatment was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010.

57.    The requested IVIG treatment was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010.

58.    The requested Rituxan treatment was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy.

59.    The requested IVIG treatment was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy.

60.    The requested Rituxan treatment was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition.

61.    The requested IVIG treatment was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition.

62.    On or about the 13th of July, 2010, UnitedHealth, by and through UnitedHealth's assigned Medical Director Dr. Sandoval, an ophthalmologist, denied the claim for Rituxan or IVIG treatment just one day prior to Mr. Skelcy's scheduled infusion.

63.    UnitedHealth's denial stated "[t]he request for Rituximab for the treatment of dermatomyositis cannot be approved. This medicine is only covered for the treatment of Wegeners granulomatosis or moderate rheumatoid arthritis. The information sent in does not show that you have one of these problems."

64.     UnitedHealth did not reference or communicate any consideration of IVIG to Mr. Skelcy or his treating rheumatologist.

65.     Subsequent to said denial, the treating rheumatologist engaged in numerous telephone conversations with UnitedHealth's assigned representatives, attempting to explain the disease/diagnosis and need for treatment, which wasted precious time.

66.     On or about July 13, 2010, UnitedHealth received a request for "Expedited Utilization Review Appeal", within the meaning ascribed by the insurance policy at issue, regarding the denial of the requested Rituxan or IVIG treatment for Mr. Skelcy that same day.

67.     On or about July 13, 2010, at 9:18 A.M. UnitedHealth received any and all requested clinical information necessary to process the expedited appeal of Mr. Skelcy.

68.     On or about July 15, 2010, UnitedHealth transmitted the expedited appeal to MES Solutions for a peer review assessment.

69.     The primary purpose of a peer review assessment in the medical field is to determine, independently, whether accepted standards of care have been met or are being followed.

70.     Despite this objective standard, Dr. Wilder ordered that a narrative comment drafted by her be submitted to MES Solutions for consideration in the "peer review assessment" of Mr. Skelcy's claim.  The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

71.    MES Solutions assigned Dr. Beighe to provide the peer review assessment of the expedited appeal of Mr. Skelcy.

72.    Dr. Beighe is licensed and located in Arizona.

73.    Neither UnitedHealth, Dr. Sandoval or Dr. Wilder transmitted or otherwise apprised Dr. Beighe of the standards of prescription drug coverage applicable to Mr. Skelcy's claim as defined in Section VIII, subsection "Prescription Drugs" and as delineated by N.J.S.A. 17B:26-2.1(g).

74.    In her peer review assessment on or about July 16, 2010, Dr. Beighe notes Mr. Skelcy previously received Rituxan in "8/2009" and reported feeling well with correspondingly normal lab results.

75.    Dr. Beighe further noted that in the two laboratory results immediately prior to her review, Mr. Skelcy's "LFTs (liver function tests) were increased…very elevated CK and aldolase." Dr. Beighe further noted that Mr. Skelcy "now had weakness and shortness of breath" and recognized that the treating rheumatologist communicated the need of "Rituxan or IVIG."

76.    Dr. Beighe concluded her peer review assessment that "[t]his type of therapy is not standard of care for this disease" and "[t]his specific therapy is not standard of care for this patient's disease". Dr. Beighe further specified that there was inadequate medical literature to conclude that Rituxan was effective in treating Mr. Skelcy's condition.

77.    Dr. Beighe did, however, conclude "IVIG would be standard of care at this point for the member."

78.    On or about July 16, 2010, UnitedHealth, by and through the direction of Dr. Wilder, again denied the request to treat Mr. Skelcy with Rituxan or IVIG.

79.   Contemporaneous with denying the claim, Dr. Wilder, in an internal memo at UnitedHealth, specified "Deny as E/I. This is a patient with dermatomyositis for who Rituxan is requested. The patient has failed standard therapy of prednisone, methotrexate, and Imuran. A board certified rheumatologist has reviewed the request and has detrermined (sic) that the request for Rituxan should be denied as unproved. The clinical data from the prevailing peer reviewed published medical literature is not adequate to conclude that the requested medication is effective in treating the member's condition. There are not at least two articles in the peer reviewed literature to show that the proposed therapy is more likely to benefit the member than standard available therapies. Other options are available such as IVIG. Therefore, the request for Rituxan is denied."

80.   UnitedHealth did not, at anytime, communicate any approval or consideration, whatsoever, of IVIG to Mr. Skelcy or his treating rheumatologist.

81.   Subsequent to said denial, the treating rheumatologist engaged in numerous telephone conversations with UnitedHealth's assigned representatives, attempting to explain the disease/diagnosis and need for treatment, which further wasted precious time.

82.   On or about July 30th, 2010, the treating rheumatologist faxed a letter to Dr. Wilder pleading that Mr. Skelcy received Rituxan in August of 2009 "with excellent response."  The letter ended with a plea that the "patient is a father, is a husband, and the main bread winner of his family" and that "[a] further deterioration of his condition…is imminent…"

83.   Thirty-two days subsequent to receiving Mr. Skelcy's claim for treatment, on or about August 9, 2010, UnitedHealth reversed its decision and transmitted an "approved" precertification for Rituxan treatment.

84.   Mr. Skelcy's treating rheumatologist immediately coordinated the scheduling of the treatment at Overlook Hospital on the first date and time of availability for the administration procedure.

85.   However, within 36 hours of UnitedHealth's decision to reverse and approve Rituxan treatment, but just prior to the administration of the treatment, on August 11, 2010, James Skelcy died.

86.   The Union County Medical Examiner's Office determined the cause of death as chronic dermatomyositis, interstitial pulmonary fibrosis, endomyocardial fibrosis, and cardiac arrhythmia.


## COUNT I: NEGLIGENCE

### (Estate of James T. Skelcy v. UnitedHealth)

87.   Plaintiff incorporates by reference paragraphs 1 – 86 as though fully set forth herein.

88.   At all times relevant herein, Mr. Skelcy fulfilled all duties and obligations required under the medical insurance agreement with UnitedHealth, including payment of all premiums.

89.   The contract of insurance issued by UnitedHealth created a fiduciary relationship with Mr. Skelcy and imposed a heightened duty to act in the best interest of the insured, particularly in providing coverage of contracted for medical benefits, complying with New Jersey law governing said contractual coverage (such as N.J.S.A. 17B:26-2.1(g) and

ensuring the health, welfare and safety of Mr. Skelcy where contractually required without arbitrarily denying valid claims on the basis of financial considerations.

90.     In accepting premium payments from Mr. Skelcy and issuing the medical policy of insurance at issue, UnitedHealth assumed a duty to provide medical coverage as specified in "New Jersey individual PPO Plan C", comply with New Jersey law governing this insurance agreement and perform its contractual duties to not endanger the health, welfare and safety of the known medical condition of Mr. Skelcy.

91.     In or about July and August of 2010, Defendant UnitedHealth was negligent in denying and delaying the proper and necessary treatment of Mr. Skelcy's condition and failed to exercise the ordinary care and diligence of an insurer in a fiduciary relationship with due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

   a)   wrongfully denying Mr. Skelcy access to medically necessary treatment;

   b)   wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

   c)   failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

   d)   failing to provide coverage as mandated by N.J.S.A. 17B:26-2.1(g);

   e)   failing to approve therapy requested pursuant to the mandates of N.J.S.A. 17B:26-2.1(g);

   f)   failing to act in a fiduciary capacity by wrongfully denying Mr. Skelcy access to medically necessary treatment;

   g)   failing to act in a fiduciary capacity by wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

   h)   wrongfully denying Mr. Skelcy access to treatment which was proven to be effective for his condition;

i)    failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

j)    failing to hire/appoint appropriate agents/employees that understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

k)    failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

l)    failing to hire/appoint appropriate agents/employees that understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

m)   failing to provide a specific reasonable basis for denying the claim exclusive of an exceedingly generalized category of denial;

n)    failing to provide the actual reasons for denial such that Mr. Skelcy and his treating physicians could employ other lifesaving treatment regimens;

o)    failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

p)    failing to properly keep and maintain a claim file for Mr. Skelcy's documented condition and his previous claims history for reference in future claims, including the claim at issue;

q)    failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

r)    failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to UnitedHealth, through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

s)    failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to UnitedHealth;

- 16 -

t)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth;

u)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth;

v)      denying the requested  Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

w)      denying the requested IVIG treatment where it was medically necessary given the refractory nature of Mr. Skelcy's condition to first line therapies;

x)      denying the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

y)      denying the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

z)      denying the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

aa)     denying the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

bb)     denying the requested IVIG treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

cc)     denying the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients

as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

dd)     denying the requested IVIG treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy.

ee)     denying the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

ff)     denying the requested IVIG treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition.

gg)     denying and delaying a valid and medically necessary claim by requesting claim history records that should reasonably be accessible or kept by UnitedHealth;

hh)     denying and delaying a valid and medically necessary claim by appointing a Medical Director licensed in ophthalmology to review a rheumatologically based claim;

ii)     tainting the peer review assessment by transmitting a narrative comment drafted by Dr. Wilder to MES Solutions for consideration in Mr. Skelcy's claim.  The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

jj)     tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

kk)     failing to communicate, at anytime, approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

ll)     failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

mm)   failing to provide Mr. Skelcy's treating rheumatologist with reasonable access to UnitedHealth's clinical peer reviewer as required by the insurance contract at issue;

nn)   failing to conclude Mr. Skelcy's expedited appeal, subsequent to receipt of all necessary information, within the timeframes set forth in the insurance agreement at issue and as specified by New Jersey law;

oo)   failing to initiate and employ a specialty case management plan for Mr. Skelcy, as defined by the insurance contract at issue;

pp)   violating its fiduciary duty to the patient by not acting in the patient's interest within the bounds of the insurance contract;

qq)   failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

rr)   not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to understand the nature of the drug, Rituxan;

ss)   not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

tt)   not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

uu)   not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research standard off-label uses of Rituxan, as a licensed medical insurer in the State of New Jersey and thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity with standard uses of the drug;

vv)   not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan, as a licensed medical insurer in the State of New Jersey and thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity of said industry studies and literature;

- 19 -

ww)   denying a medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

xx)   wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis;

yy)   delaying and not properly or promptly adjusting the denial upon receipt of "office notes detailing the medical necessity of CPT code J9310 for dx 710.3" as requested;

zz)   delaying/denying approval after the treating rheumatologist accurately provided records, including but not limited to, all records requested by the insurance company; records detailing imminence; records detailing necessity; and records detailing proven use of the drug Rituxan for the clinical diagnosis;

aaa)   failing to accept a reasonable statement by a professional medical doctor that a medication was imminently necessary to treat Mr. Skelcy;

bbb)   failing to acknowledge the increased risk of harm a denial of treatment would cause Mr. Skelcy;

ccc)   failing to acknowledge the increased risk of harm a delay in treatment would cause Mr. Skelcy;

ddd)   wrongfully interfering with a patient-doctor relationship without cause or justification;

eee)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

fff)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, as is the usual course of Rituxan therapy;

ggg)   approving Rituxan therapy in August and September of 2009 and causing Mr. Skelcy's treating physicians to detrimentally rely on the continued use, availability and coverage of this treatment;

hhh)   denying and delaying treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

- 20 -

      iii)    wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

      jjj)    wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

92.    As a direct and proximate result of the negligence, gross negligence, and/or recklessness of the Defendant, UnitedHealth, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

93.    The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety. Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

94.    The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

95.    The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

      WHEREFORE, Plaintiff demand judgment against the Defendant, UnitedHealth for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

## COUNT II: BREACH OF CONTRACT

### (Estate of James T. Skelcy v. UnitedHealth)

96.    Plaintiff incorporates by reference paragraphs 1-95 as though fully set forth herein.

97.    A contract of medical insurance was issued for the coverage of James T. Skelcy, by UnitedHealth, and created a contractual relationship between the parties.

98.    In exchange for payment of premiums, UnitedHealth agreed to provide payment of medical claims within the terms and conditions of the policy and within the laws of the State of New Jersey applicable to said policy.

99.    At all times relevant herein, Plaintiff fulfilled all duties and obligations required under the medical insurance agreement with UnitedHealth, including payment of all premiums.

100.   In accepting premium payments from the Plaintiff and issuing the medical policy of insurance at issue, UnitedHealth was contractually obligated to perform all duties regarding providing medical coverage and reviewing medical claims as specified in "New Jersey individual PPO Plan C", comply with New Jersey law governing this insurance agreement and perform its contractual duties to not endanger the health, welfare and safety of the known medical condition of Mr. Skelcy.

101.   In or about July and August of 2010, Defendant UnitedHealth breached the insurance agreement between the parties in denying and delaying the proper and necessary treatment of Mr. Skelcy's condition, failing to perform under the contract and disregarding the terms and conditions of the agreement, all without due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

a)      wrongfully denying Mr. Skelcy access to medically necessary treatment;

b)      wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

c)      failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

d)      failing to provide coverage as mandated by N.J.S.A. 17B:26-2.1(g);

e)      failing to approve therapy requested pursuant to the mandates of N.J.S.A. 17B:26-2.1(g);

f)      failing to comply with the contract by wrongfully denying Mr. Skelcy access to medically necessary treatment;

g)      failing to comply with the contract by wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

h)      wrongfully denying Mr. Skelcy access to treatment which was proven to be effective for his condition;

i)      failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

j)      failing to hire/appoint appropriate agents/employee that understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

k)      failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

l)      failing to hire/appoint appropriate agents/employees that understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

m)      failing to provide a specific reasonable basis for denying the claim exclusive of an exceedingly generalized category of denial;

n)      failing to provide the actual reasons for denial such that Mr. Skelcy and his treating physicians could employ other lifesaving treatment regimens;

o)      failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent

- 23 -

response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

p)      failing to properly keep and maintain a claim file for Mr. Skelcy's documented condition and his previous claims history for reference in future claims, including the claim at issue;

q)      failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

r)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to UnitedHealth, through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

s)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to UnitedHealth;

t)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth;

u)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in records transmitted to UnitedHealth;

v)      denying the requested  Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

w)      denying the requested IVIG treatment where it was medically necessary given the refractory nature of Mr. Skelcy's condition to first line therapies;

x)      denying the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

y)      denying the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

z)      denying the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

aa)     denying the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

bb)     denying the requested IVIG treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

cc)     denying the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

dd)     denying the requested IVIG treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy.

ee)     denying the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

ff)     denying the requested IVIG treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition.

gg)     denying and delaying a valid and medically necessary claim by requesting claim history records that should reasonably be accessible or kept by UnitedHealth;

- 25 -

hh)     denying and delaying a valid and medically necessary claim by
         appointing a Medical Director licensed in ophthalmology to review a
         rheumatologically based claim;

ii)      tainting the peer review assessment by transmitting a narrative comment
         drafted by Dr. Wilder to MES Solutions for consideration in Mr.
         Skelcy's claim.  The comment stated "[t]he literature has some reports
         in PubMed that Rituxan is effective for this conition (sic) but it is not
         the standard of care and it is not listed in Micromedex with a
         recommendation. Please review with this comment in mind and also
         that the patient had a response to Rituxan in the past. Ivig is also
         mention (sic) by the physician as an alternative."

jj)      tainting the peer review assessment by failing to frame the claim issues
         within the applicable standards as found in Section VIII, subsection
         "Prescription Drugs" of the insurance contract at issue and as
         delineated by N.J.S.A. 17B:26-2.1(g);

kk)     failing to communicate, at anytime, approval or consideration of IVIG
         treatment to Mr. Skelcy or his treating rheumatologist;

ll)      failing to review coverage within the applicable standards as found in
         Section VIII, subsection "Prescription Drugs" of the insurance contract
         at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

mm)   failing to provide Mr. Skelcy's treating rheumatologist with reasonable
         access to UnitedHealth's clinical peer reviewer as required by the
         insurance contract at issue;

nn)     failing to conclude Mr. Skelcy's expedited appeal, subsequent to
         receipt of all necessary information, within the timeframes set forth in
         the insurance agreement at issue and as specified by New Jersey law;

oo)     failing to initiate and employ a specialty case management plan for
         Mr. Skelcy, as defined by the insurance contract at issue;

pp)     violating its fiduciary duty to the patient by not acting in the patient's
         interest within the bounds of the insurance contract;

qq)     failing to review and adequately assess the documentation of medical
         necessity and imminent need of treatment submitted by the treating
         physician;

rr)      not exercising or exhibiting reasonable skill, care and knowledge
         requisite to the health insurance claim industry by failing to understand
         the nature of the drug, Rituxan;

- 26 -

ss)     not exercising or exhibiting reasonable skill, care and knowledge
        requisite to the health insurance claim industry by failing to know or
        research industry studies showing effectiveness of Rituxan in treating
        resistant dermatomyositis;

tt)     not exercising or exhibiting reasonable skill, care and knowledge
        requisite to the health insurance claim industry by failing to know or
        research typical patient responses to Rituxan and recognizing Mr.
        Skelcy's exceedingly positive response to the drug in August of 2009;

uu)     not exercising or exhibiting reasonable skill, care and knowledge
        requisite to the health insurance claim industry by failing to know or
        research standard off-label uses of Rituxan, as a licensed medical
        insurer in the State of New Jersey and thereby causing Mr. Skelcy to
        detrimentally rely upon the reasonable supposition of his insurers
        familiarity with standard uses of the drug;

vv)     not exercising or exhibiting reasonable skill, care and knowledge
        requisite to the health insurance claim industry by failing to know or
        research the pertinent clinical studies or review articles in major-peer
        reviewed professional journals on the treatment of dermatomyositis
        with Rituxan, as a licensed medical insurer in the State of New Jersey
        and thereby causing Mr. Skelcy to detrimentally rely upon the
        reasonable supposition of his insurers familiarity of said industry
        studies and literature;

ww)     denying a medically necessary treatment despite the existence of
        numerous supportive clinical studies or review articles in major peer-
        reviewed professional journals;

xx)     wrongfully shifting the burden upon the treating rheumatologist to
        prove the industry recognition of the efficacy of Rituxan in treating
        dermatomyositis;

yy)     delaying and not properly or promptly adjusting the denial upon
        receipt of "office notes detailing the medical necessity of CPT code
        J9310 for dx 710.3" as requested;

zz)     delaying/denying approval after the treating rheumatologist accurately
        provided records, including but not limited to, all records requested by
        the insurance company; records detailing imminence; records detailing
        necessity; and records detailing proven use of the drug Rituxan for the
        clinical diagnosis;

aaa)    failing to accept a reasonable statement by a professional medical
        doctor that a medication was imminently necessary to treat Mr.
        Skelcy;

bbb)   failing to acknowledge the increased risk of harm a denial of treatment would cause Mr. Skelcy;

ccc)   failing to acknowledge the increased risk of harm a delay in treatment would cause Mr. Skelcy;

ddd)   wrongfully interfering with a patient-doctor relationship without cause or justification;

eee)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

fff)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, as is the usual course of Rituxan therapy;

ggg)   approving Rituxan therapy in August and September of 2009 and causing Mr. Skelcy's treating physicians to detrimentally rely on the continued use, availability and coverage of this treatment;

hhh)   denying and delaying treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

iii)   wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

jjj)   wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

102.  As a direct and proximate result of the breach of contract of the Defendant, UnitedHealth, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

103.  The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied

by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety. Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

104.   The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of <u>N.J.S.A.</u> 2A:15-3.

105.   The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as <u>N.J.S.A.</u> 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendant, UnitedHealth for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

## COUNT III: NEGLIGENCE PER SE

### (Estate of James T. Skelcy v. UnitedHealth)

106.   Plaintiff incorporates by reference paragraphs 1-105 as though fully set forth herein.

107.   At all times relevant herein, Plaintiff fulfilled all duties and obligations required under the medical insurance agreement with UnitedHealth, including payment of all premiums.

108.   As an insurer engaged in transacting the business of insurance in the State of New Jersey within the meaning of N.J.S.A. 17:32-19, UnitedHealth was required to

comply with the laws in the State of New Jersey which govern policies of health insurance, such as the policy of insurance covering Mr. Skelcy.

109.  N.J.S.A. 17B:26-2.1(g) is applicable to the policy of insurance at issue in the within matter.

110.  N.J.S.A. 17B:26-2.1(g) requires UnitedHealth to provide Mr. Skelcy coverage for expenses incurred in prescribing a drug for a treatment for which it has not been approved by the Food and Drug Administration if the drug is recognized as being medically appropriate for the specific type of treatment for which the drug has been prescribed in one of the following established reference compendia: (1) the American Medical Association Drug Evaluations; (2) the American Hospital Formulary Service Drug Information; (3) the United States Pharmacopoeia Drug Information; or, it is recommended by a clinical study or review article in a major-peer reviewed professional journal.

111.  The New Jersey "Health Claims Authorization, Processing and Payment Act", N.J.S.A. 17B:30-48 et. seq., is applicable to the policy of insurance at issue in the within matter.

112.  At all relevant times herein, Mr. Skelcy was a "patient" as defined by N.J.S.A. 17B:30-42.

113.  At all relevant times herein, the health insurance agreement at issue was a "health plan" as defined by N.J.S.A. 17B:30-42 and a "health benefits plan" as defined by N.J.S.A. 17B:30-50.

114.  At all relevant times herein, Defendant, UnitedHealth was a "carrier" and a "payer" as defined by N.J.S.A. 17B:30-50.

115.  N.J.S.A. 17B:30-52 requires that denial of a request for authorization or limitation imposed by a payer on a requested service shall be made by a physician under the clinical direction of the medical director who shall be licensed in the State of New Jersey.

116.  In or about July and August of 2010, Defendant UnitedHealth was negligent per se in denying and delaying the proper and necessary treatment of Mr. Skelcy's condition with due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

     a.     wrongfully denying Mr. Skelcy access to medically necessary treatment;

     b.     wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

     c.     wrongfully denying Mr. Skelcy access to treatment which was proven to be effective for his condition;

     d.     failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

     e.     failing to provide coverage as mandated by N.J.S.A. 17B:26-2.1(g);

     f.     failing to approve therapy requested pursuant to the mandates of N.J.S.A. 17B:26-2.1(g);

     g.     denying the requested  Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

     h.     denying the requested IVIG treatment where it was medically necessary given the refractory nature of Mr. Skelcy's condition to first line therapies;

     i.     appointing a medical director to Mr. Skelcy's claim who was not licensed in this State;

     j.     denying the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

k.    denying the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

l.    denying the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

m.    denying the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

n.    denying the requested IVIG treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

o.    denying the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

p.    denying the requested IVIG treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy.

q.    denying the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

r.    denying the requested IVIG treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition.

s.    not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to understand the nature of the drug, Rituxan;

t.    not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

u.      not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

v.      not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research standard off-label uses of Rituxan, as a licensed medical insurer in the State of New Jersey and thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity with standard uses of the drug;

w.      not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan, as a licensed medical insurer in the State of New Jersey and thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity of said industry studies and literature;

x.      denying a medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

y.      wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis; and

z.      delaying and not properly or promptly adjusting the denial upon receipt of "office notes detailing the medical necessity of CPT code J9310 for dx 710.3" as requested.

117.  As a direct and proximate result of the negligence per se of the Defendant, UnitedHealth, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

118.  Mr. Skelcy, as an insured, was in the class of persons designed to be protected and/or suffered the type of harm the above referenced statutes were designed to prevent.

- 33 -

119.  The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety. Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

120.  The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

121.  The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendant, UnitedHealth for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.


**COUNT IV: BAD FAITH / BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Estate of James T. Skelcy v. UnitedHealth)**

122.  Plaintiff incorporates by reference paragraphs 1-121 as though fully set forth herein.

123.  The Defendant, UnitedHealth, is held to an implied covenant of good faith and fair dealing concerning its duties and obligations under the terms of its health insurance policy with Mr. Skelcy.

124.  The Defendant, UnitedHealth, has engaged in unfair and deceptive claims settlement practices in denying and delaying coverage to Mr. Skelcy, in violation of the Unfair Claims Settlement Practices Act, N.J.S.A. 17B:30-13.1.

125.  The Defendant, UnitedHealth, has engaged in unfair and deceptive claims settlement practices in denying and delaying coverage to Mr. Skelcy, in violation of the Unfair Claims Settlement Practices Act, N.J.A.C. 11:2-17.8.

126.  The Defendant, UnitedHealth, has acted in bad faith in denying and delaying coverage to Mr. Skelcy, as defined by the common law in the State of New Jersey.

127.  In or about July and August of 2010, Defendant UnitedHealth engaged in unfair and deceptive claims settlement practices and engaged in bad faith toward its insured's safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

a)   wrongfully denying Mr. Skelcy access to medically necessary treatment where it was not fairly debatable;

b)   wrongfully delaying Mr. Skelcy's access to medically necessary treatment where it was not fairly debatable;

c)   failing to act in a fiduciary capacity by wrongfully denying Mr. Skelcy access to medically necessary treatment where it was not fairly debatable;

d)   failing to act in a fiduciary capacity by wrongfully delaying Mr. Skelcy's access to medically necessary treatment where it was not fairly debatable;

e)   wrongfully denying Mr. Skelcy access to treatment which was proven to be effective for his condition and said denial was not fairly debatable;

f)   failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

g)      failing to hire/appoint appropriate agents/employee that understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

h)      failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

i)      failing to hire/appoint appropriate agents/employees that understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

j)      failing to provide a specific reasonable basis for denying the claim exclusive of an exceedingly generalized category of denial;

k)      failing to provide the actual reasons for denial such that Mr. Skelcy and his treating physicians could employ other lifesaving treatment regimens;

l)      failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

m)      failing to properly keep and maintain a claim file for Mr. Skelcy's documented condition and his previous claims history for reference in future claims, including the claim at issue;

n)      failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

o)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to UnitedHealth, through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

p)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to UnitedHealth;

q)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of

medical necessity and as corroborated in the records transmitted to
UnitedHealth;

r)    failing to appreciate the imminence of Mr. Skelcy's condition and
dangerousness of delaying treatment which was, or should have been,
immediately apparent to UnitedHealth given Mr. Skelcy's presenting
symptomology, including weakness and shortness of breath, conveyed
through the letter of medical necessity and as corroborated in the
records transmitted to UnitedHealth;

s)    denying the requested  Rituxan treatment where it was not fairly
debatable given the refractory nature of Mr. Skelcy condition to first
line therapies;

t)    denying the requested IVIG treatment where it was not fairly debatable
given the refractory nature of Mr. Skelcy's condition to first line
therapies;

u)    denying the requested Rituxan treatment where it was not fairly
debatable given the prior approval of UnitedHealth approximately one
year prior;

v)    denying the requested Rituxan treatment where it was not fairly
debatable given Mr. Skelcy's excellent response to the drug
approximately one year prior and achievement of complete resolution
of symptoms;

w)    denying the requested Rituxan treatment where it was not fairly
debatable given the approval and administration of the drug
approximately one year prior and the medical presumption that a
maintenance dose will be required in the future when/if symptomology
returns;

x)    denying the requested Rituxan treatment where it was not fairly
debatable given the presenting symptomology, laboratory results and
imminency of Mr. Skelcy's condition as of July 2010;

y)    denying the requested IVIG treatment where it was not fairly debatable
given the presenting symptomology, laboratory results and imminency
of Mr. Skelcy's condition as of July 2010;

z)    denying the requested Rituxan treatment where it was not fairly
debatable given the supporting medical literature for myositis patients
as of July 2010, particularly resistant myositis patients such as Mr.
Skelcy;

- 37 -

aa)    denying the requested IVIG treatment where it was not fairly debatable given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy.

bb)    denying the requested Rituxan treatment where it was not fairly debatable given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

cc)    denying the requested IVIG treatment where it was not fairly debatable given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition.

dd)    denying and delaying a valid claim which was not fairly debatable by requesting claim history records that should reasonably be accessible or kept by UnitedHealth;

ee)    denying and delaying a valid claim which was not fairly debatable by appointing a Medical Director licensed in ophthalmology to review a rheumatologically based claim;

ff)    tainting the peer review assessment by transmitting a narrative comment drafted by Dr. Wilder to MES Solutions for consideration in Mr. Skelcy's claim. The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

gg)    tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

hh)    failing to communicate, at anytime, approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

ii)    failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

jj)    failing to provide coverage as mandated by N.J.S.A. 17B:26-2.1(g);

kk)    failing to approve therapy requested pursuant to the mandates of N.J.S.A. 17B:26-2.1(g);

ll)     failing to provide Mr. Skelcy's treating rheumatologist with reasonable access to UnitedHealth's clinical peer reviewer as required by the insurance contract at issue;

mm)   failing to conclude Mr. Skelcy's expedited appeal, subsequent to receipt of all necessary information, within the timeframes set forth in the insurance agreement at issue and as specified by New Jersey law;

nn)    failing to initiate and employ a specialty case management plan for Mr. Skelcy, as defined by the insurance contract at issue;

oo)    violating its fiduciary duty to the patient by not acting in the patient's interest within the bounds of the insurance contract;

pp)    failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

qq)    not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to understand the nature of the drug, Rituxan;

rr)    not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

ss)    not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

tt)    not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research standard off-label uses of Rituxan, as a licensed medical insurer in the State of New Jersey and thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity with standard uses of the drug;

uu)    not exercising or exhibiting reasonable skill, care and knowledge requisite to the health insurance claim industry by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan, as a licensed medical insurer in the State of New Jersey and thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity of said industry studies and literature;

vv)   denying a medically necessary treatment which was not fairly debatable, despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

ww)   wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis;

xx)   delaying and not properly or promptly adjusting the denial upon receipt of "office notes detailing the medical necessity of CPT code J9310 for dx 710.3" as requested;

yy)   delaying/denying approval after the treating rheumatologist accurately provided records, including but not limited to, all records requested by the insurance company; records detailing imminence; records detailing necessity; and records detailing proven use of the drug Rituxan for the clinical diagnosis;

zz)   failing to accept a reasonable statement by a professional medical doctor that a medication was imminently necessary to treat Mr. Skelcy;

aaa)   failing to acknowledge the increased risk of harm a denial of treatment would cause Mr. Skelcy;

bbb)   failing to acknowledge the increased risk of harm a delay in treatment would cause Mr. Skelcy;

ccc)   wrongfully interfering with a patient-doctor relationship without cause or justification;

ddd)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

eee)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, as is the usual course of Rituxan therapy;

fff)   approving Rituxan therapy in August and September of 2009 and causing Mr. Skelcy's treating physicians to detrimentally rely on the continued use, availability and coverage of this treatment;

ggg)   denying and delaying treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

- 40 -

hhh)   wrongfully weighing human life against the financial burden of providing contracted for medical benefits;  and

iii)   wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

128.    As a direct and proximate result of the unfair claims practices and/or bad faith of the Defendant, UnitedHealth, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

129.    The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

130.    The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the common law remedies regarding bad faith claims practices of insurers, including, but not limited to punitive damages and foreseeable consequential damages.

131.    The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

132.    The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendant, UnitedHealth for the wrongful death of the Decedent, James T. Skelcy, for such damages as would

reasonably and properly compensate in accordance with the laws of the State of New

Jersey, together with punitive damages, interest and costs of suit.


## COUNT V: NEGLIGENCE

### (Estate of James T. Skelcy v. Dennis Sandoval, M.D., individually and as an employee/agent of UnitedHealth, and Gail Wilder, M.D., individually and as an employee/agent of UnitedHealth)

133.     Plaintiff incorporates by reference paragraphs 1-132 as though fully set forth

herein.

134.     At all times relevant herein, Mr. Skelcy fulfilled all duties and obligations

required under the medical insurance agreement with UnitedHealth, including payment of

all premiums.

135.     The contract of insurance issued by UnitedHealth created a fiduciary

relationship with Mr. Skelcy and imposed a heightened duty on employees and agents of

UnitedHealth, such as Dr. Sandoval and Dr. Wilder, to act in the best interest of the insured,

particularly in providing coverage of contracted for medical benefits, complying with New

Jersey law governing said contractual coverage (such as N.J.S.A. 17B:26-2.1(g) and

ensuring the health, welfare and safety of Mr. Skelcy where contractually required without

arbitrarily denying valid claims on the basis of financial considerations.

136.      In accepting premium payments from Mr. Skelcy and issuing the medical

policy of insurance at issue, UnitedHealth assumed a duty to provide medical coverage as

specified in "New Jersey individual PPO Plan C", comply with New Jersey law governing

this insurance agreement and perform, through employees/agents such as Dr. Sandoval

and Dr. Wilder, its contractual duties to not endanger the health, welfare and safety of the known medical condition of Mr. Skelcy.

137.     In or about July and August of 2010, Defendants Dr. Sandoval and Dr. Wilder were negligent in reviewing, denying and delaying the proper and necessary treatment of Mr. Skelcy's condition and failed to exercise the ordinary care and diligence of an employee/agent responsible for the oversight and treatment decisions of health insurance claims, with due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

a)     wrongfully denying Mr. Skelcy access to medically necessary treatment;

b)     wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

c)     failing to act in a fiduciary capacity by wrongfully denying Mr. Skelcy access to medically necessary treatment;

d)     failing to act in a fiduciary capacity by wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

e)     wrongfully denying Mr. Skelcy access to treatment which was proven to be effective for his condition;

f)     failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

g)     failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

h)     failing to provide a specific reasonable basis for denying the claim exclusive of an exceedingly generalized category of denial;

i)     failing to provide the actual reasons for denial such that Mr. Skelcy and his treating physicians could employ other lifesaving treatment regimens;

j)     failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent

response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

k)      failing to properly keep and maintain a claim file for Mr. Skelcy's documented condition and his previous claims history for reference in future claims, including the claim at issue;

l)      failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

m)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to Dr. Sandoval and Dr. Wilder, through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

n)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Sandoval and Dr. Wilder given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to UnitedHealth;

o)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Sandoval and Dr. Wilder given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth;

p)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Sandoval and Dr. Wilder given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth;

q)      denying the requested  Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

r)      denying the requested IVIG treatment where it was medically necessary given the refractory nature of Mr. Skelcy's condition to first line therapies;

s)      denying the requested Rituxan treatment where it was medically
        necessary given the prior approval of UnitedHealth approximately one
        year prior;

t)      denying the requested Rituxan treatment where it was medically
        necessary given Mr. Skelcy's excellent response to the drug
        approximately one year prior and achievement of complete resolution
        of symptoms;

u)      denying the requested Rituxan treatment where it was medically
        necessary given the approval and administration of the drug
        approximately one year prior and the medical presumption that a
        maintenance dose will be required in the future when/if symptomology
        returns;

v)      denying the requested Rituxan treatment where it was medically
        necessary given the presenting symptomology, laboratory results and
        imminency of Mr. Skelcy's condition as of July 2010;

w)      denying the requested IVIG treatment where it was medically
        necessary given the presenting symptomology, laboratory results and
        imminency of Mr. Skelcy's condition as of July 2010;

x)      denying the requested Rituxan treatment where it was medically
        necessary given the supporting medical literature for myositis patients
        as of July 2010, particularly resistant myositis patients such as Mr.
        Skelcy;

y)      denying the requested IVIG treatment where it was medically
        necessary given the supporting medical literature for myositis patients
        as of July 2010, particularly resistant myositis patients such as Mr.
        Skelcy.

z)      denying the requested Rituxan treatment where it was medically
        necessary given the opinion of Mr. Skelcy's treating specialist, a
        rheumatologist with a positive history in analyzing and successfully
        navigating Mr. Skelcy's condition;

aa)     denying the requested IVIG treatment where it was medically
        necessary given the opinion of Mr. Skelcy's treating specialist, a
        rheumatologist with a positive history in analyzing and successfully
        navigating Mr. Skelcy's condition.

bb)     denying and delaying a valid and medically necessary claim by
        requesting claim history records that should reasonably be accessible
        or kept by UnitedHealth;

cc)     denying and delaying a valid and medically necessary claim where Dr. Sandoval knew, or should have known, as an ophthalmologist, that he lacked the requisite knowledge to competently review a rheumatologically based claim;

dd)     tainting the peer review assessment by transmitting a narrative comment drafted by Dr. Wilder to MES Solutions for consideration in Mr. Skelcy's claim.  The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

ee)     tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

ff)     failing to communicate, at anytime, approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

gg)     failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

hh)     failing to provide Mr. Skelcy's treating rheumatologist with reasonable access to UnitedHealth's clinical peer reviewer as required by the insurance contract at issue;

ii)     failing to conclude Mr. Skelcy's expedited appeal, subsequent to receipt of all necessary information, within the timeframes set forth in the insurance agreement at issue and as specified by New Jersey law;

jj)     failing to initiate and employ a specialty case management plan for Mr. Skelcy, as defined by the insurance contract at issue;

kk)     violating their fiduciary duty to the patient by not acting in the patient's interest within the bounds of the insurance contract;

ll)     failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

mm)    not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to understand the nature of the drug, Rituxan;

- 46 -

nn)     not exercising or exhibiting reasonable skill, care and knowledge of a
        medical professional in the health insurance claim industry by failing
        to know or research industry studies showing effectiveness of Rituxan
        in treating resistant dermatomyositis;

oo)     not exercising or exhibiting reasonable skill, care and knowledge of a
        medical professional in the health insurance claim industry by failing
        to know or research typical patient responses to Rituxan and
        recognizing Mr. Skelcy's exceedingly positive response to the drug in
        August of 2009;

pp)     not exercising or exhibiting reasonable skill, care and knowledge of a
        medical professional in the health insurance claim industry by failing
        to know or research standard off-label uses of Rituxan, thereby
        causing Mr. Skelcy to detrimentally rely upon the reasonable
        supposition of his insurers familiarity with standard uses of the drug;

qq)     not exercising or exhibiting reasonable skill, care and knowledge of a
        medical professional in the health insurance claim industry by failing
        to know or research the pertinent clinical studies or review articles in
        major-peer reviewed professional journals on the treatment of
        dermatomyositis with Rituxan, thereby causing Mr. Skelcy to
        detrimentally rely upon the reasonable supposition of his insurers
        familiarity of said industry studies and literature;

rr)     denying a medically necessary treatment despite the existence of
        numerous supportive clinical studies or review articles in major peer-
        reviewed professional journals;

ss)     wrongfully shifting the burden upon the treating rheumatologist to
        prove the industry recognition of the efficacy of Rituxan in treating
        dermatomyositis;

tt)     delaying and not properly or promptly adjusting the denial upon
        receipt of "office notes detailing the medical necessity of CPT code
        J9310 for dx 710.3" as requested;

uu)     delaying/denying approval after the treating rheumatologist accurately
        provided records, including but not limited to, all records requested by
        the insurance company; records detailing imminence; records detailing
        necessity; and records detailing proven use of the drug Rituxan for the
        clinical diagnosis;

vv)     failing to accept a reasonable statement by a professional medical
        doctor that a medication was imminently necessary to treat Mr.
        Skelcy;

- 47 -

ww)   failing to acknowledge the increased risk of harm a denial of treatment would cause Mr. Skelcy;

xx)   failing to acknowledge the increased risk of harm a delay in treatment would cause Mr. Skelcy;

yy)   wrongfully interfering with a patient-doctor relationship without cause or justification;

zz)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

aaa)  assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, as is the usual course of Rituxan therapy;

bbb)  approving Rituxan therapy in August and September of 2009 and causing Mr. Skelcy's treating physicians to detrimentally rely on the continued use, availability and coverage of this treatment;

ccc)  denying and delaying treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

ddd)  wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

eee)  wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

138.    As a direct and proximate result of the negligence, gross negligence, and/or recklessness of the Defendants, Gail Wilder M.D. and Dennis Sandoval M.D., individually and as employees/agents of UnitedHealth, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

139.    The harmed suffered by Mr. Skelcy was the result of these Defendant's acts and/or omissions, both jointly and independently, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, these Defendants are liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

140.    The Defendants are liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

141.    The Defendants are liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendants, Gail Wilder M.D. and Dennis Sandoval M.D., individually and as employees/agents of UnitedHealth, for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

## COUNT VI: NEGLIGENCE PER SE

**(Estate of James T. Skelcy v. Dennis Sandoval, M.D., individually and as an employee/agent of UnitedHealth, and Gail Wilder, M.D., individually and as an employee/agent of UnitedHealth)**

142.    Plaintiff incorporates by reference paragraphs 1-141 as though fully set forth herein.

143.      As an insurer engaged in transacting the business of insurance in the State

of New Jersey within the meaning of N.J.S.A. 17:32-19, employees and agents of

UnitedHealth, such as Dr. Sandoval and Dr. Wilder, were required to comply with the laws

in the State of New Jersey which govern policies of health insurance, such as the policy

of insurance covering Mr. Skelcy.

144.      N.J.S.A. 17B:26-2.1(g) is applicable to the policy of insurance at issue in the

within matter.

145.      N.J.S.A. 17B:26-2.1(g) requires health insurers to provide coverage for

expenses incurred in prescribing a drug for a treatment for which it has not been

approved by the Food and Drug Administration if the drug is recognized as being

medically appropriate for the specific type of treatment for which the drug has been

prescribed in one of the following established reference compendia: (1) the American

Medical Association Drug Evaluations; (2) the American Hospital Formulary Service

Drug Information; (3) the United States Pharmacopoeia Drug Information; or, it is

recommended by a clinical study or review article in a major-peer reviewed professional

journal.

146.      The New Jersey "Health Claims Authorization, Processing and Payment

Act", N.J.S.A. 17B:30-48 et. seq., is applicable to the policy of insurance at issue in the

within matter.

147.      At all relevant times herein, Mr. Skelcy was a "patient" as defined by

N.J.S.A. 17B:30-42.

148.    At all relevant times herein, the health insurance agreement at issue was a "health plan" as defined by N.J.S.A. 17B:30-42 and a "health benefits plan" as defined by N.J.S.A. 17B:30-50.

149.    At all relevant times herein, Defendant, UnitedHealth was a "carrier" and a "payer" as defined by N.J.S.A. 17B:30-50.

150.    N.J.S.A. 17B:30-52 requires that denial of a request for authorization or limitation imposed by a payer on a requested service shall be made by a physician under the clinical direction of the medical director who shall be licensed in the State of New Jersey.

151.    In or about July and August of 2010, Defendants, Dr. Sandoval and Dr. Wilder, were negligent per se in denying and delaying the proper and necessary treatment of Mr. Skelcy's condition with due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

   a)     wrongfully denying Mr. Skelcy access to medically necessary treatment;

   b)     wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

   c)     failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

   d)     failing to provide coverage as mandated by N.J.S.A. 17B:26-2.1(g);

   e)     failing to approve therapy requested pursuant to the mandates of N.J.S.A. 17B:26-2.1(g);

   f)     wrongfully denying Mr. Skelcy access to treatment which was proven to be effective for his condition;

   g)     denying the requested Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

h)      denying the requested IVIG treatment where it was medically necessary given the refractory nature of Mr. Skelcy's condition to first line therapies;

i)      acting in the capacity of medical director over Mr. Skelcy's claim when not licensed in this State;

j)      denying the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

k)      denying the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

l)      denying the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

m)      denying the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

n)      denying the requested IVIG treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

o)      denying the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

p)      denying the requested IVIG treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy.

q)      denying the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

r)      denying the requested IVIG treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a

rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition.

s)    not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to understand the nature of the drug, Rituxan;

t)    not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

u)    not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

v)    not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research standard off-label uses of Rituxan, thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity with standard uses of the drug;

w)    not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan, thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity of said industry studies and literature;

x)    denying a medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

y)    wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis; and

z)    delaying and not properly or promptly adjusting the denial upon receipt of "office notes detailing the medical necessity of CPT code J9310 for dx 710.3" as requested.

152.    As a direct and proximate result of the negligence per se of the

Defendants, Gail Wilder M.D. and Dennis Sandoval M.D., individually and as

employees/agents of UnitedHealth, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

153.      Mr. Skelcy, as an insured, was in the class of persons designed to be protected and/or suffered the type of harm the above referenced statutes were designed to prevent.

154.      The harmed suffered by Mr. Skelcy was the result of these Defendant's acts and/or omissions, both jointly and independently, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, these Defendants are liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

155.      The Defendants are liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

156.      The Defendants are liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendants, Gail Wilder M.D. and Dennis Sandoval M.D., individually and as employees/agents of UnitedHealth, for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

## COUNT VII: BAD FAITH / BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

### (Estate of James T. Skelcy v. Dennis Sandoval, M.D., individually and as an employee/agent of UnitedHealth, and Gail Wilder, M.D., individually and as an employee/agent of UnitedHealth)

157.     Plaintiff incorporates by reference paragraphs 1-156 as though fully set forth herein.

158.     The Defendant, UnitedHealth, is held to an implied covenant of good faith and fair dealing concerning its duties and obligations under the terms of its health insurance policy with Mr. Skelcy.

159.     As employees and agents of UnitedHealth, Defendants Dr. Sandoval and Dr. Wilder held to an implied covenant of good faith and fair dealing under the terms of its health insurance policy with Mr. Skelcy.

160.     The Defendants, Dr. Sandoval and Dr. Wilder, have engaged in unfair and deceptive claims settlement practices in denying and delaying coverage to Mr. Skelcy, in violation of the Unfair Claims Settlement Practices Act, N.J.S.A. 17B:30-13.1.

161.     The Defendants, Dr. Sandoval and Dr. Wilder, have engaged in unfair and deceptive claims settlement practices in denying and delaying coverage to Mr. Skelcy, in violation of the Unfair Claims Settlement Practices Act, N.J.A.C. 11:2-17.8.

162.     The Defendants, Dr. Sandoval and Dr. Wilder, have acted in bad faith in denying and delaying coverage to Mr. Skelcy, as defined by the common law in the State of New Jersey.

163.       In or about July and August of 2010, Defendants Dr. Sandoval and Dr. Wilder engaged in unfair and deceptive claims settlement practices and engaged in bad faith toward Mr. Skelcy's safety, well-being, and rights, which acts and/or omissions included, but were not limited to, the following:

a)     wrongfully denying Mr. Skelcy access to medically necessary treatment where it was not fairly debatable;

b)     wrongfully delaying Mr. Skelcy's access to medically necessary treatment where it was not fairly debatable;

c)     failing to act in a fiduciary capacity by wrongfully denying Mr. Skelcy access to medically necessary treatment where it was not fairly debatable;

d)     failing to act in a fiduciary capacity by wrongfully delaying Mr. Skelcy's access to medically necessary treatment where it was not fairly debatable;

e)     wrongfully denying Mr. Skelcy access to treatment which was proven to be effective for his condition and said denial was not fairly debatable;

f)     failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

g)     failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

h)     failing to provide a specific reasonable basis for denying the claim exclusive of an exceedingly generalized category of denial;

i)     failing to provide the actual reasons for denial such that Mr. Skelcy and his treating physicians could employ other lifesaving treatment regimens;

j)     failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

k)     failing to properly keep and maintain a claim file for Mr. Skelcy's documented condition and his previous claims history for reference in future claims, including the claim at issue;

- 56 -

l)      failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

m)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to UnitedHealth, through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

n)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to UnitedHealth;

o)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth;

p)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to UnitedHealth given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to UnitedHealth;

q)      denying the requested  Rituxan treatment where it was not fairly debatable given the refractory nature of Mr. Skelcy condition to first line therapies;

r)      denying the requested IVIG treatment where it was not fairly debatable given the refractory nature of Mr. Skelcy's condition to first line therapies;

s)      denying the requested Rituxan treatment where it was not fairly debatable given the prior approval of UnitedHealth approximately one year prior;

t)      denying the requested Rituxan treatment where it was not fairly debatable given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

u)      denying the requested Rituxan treatment where it was not fairly
        debatable given the approval and administration of the drug
        approximately one year prior and the medical presumption that a
        maintenance dose will be required in the future when/if symptomology
        returns;

v)      denying the requested Rituxan treatment where it was not fairly
        debatable given the presenting symptomology, laboratory results and
        imminency of Mr. Skelcy's condition as of July 2010;

w)      denying the requested IVIG treatment where it was not fairly debatable
        given the presenting symptomology, laboratory results and imminency
        of Mr. Skelcy's condition as of July 2010;

x)      denying the requested Rituxan treatment where it was not fairly
        debatable given the supporting medical literature for myositis patients
        as of July 2010, particularly resistant myositis patients such as Mr.
        Skelcy;

y)      denying the requested IVIG treatment where it was not fairly debatable
        given the supporting medical literature for myositis patients as of July
        2010, particularly resistant myositis patients such as Mr. Skelcy.

z)      denying the requested Rituxan treatment where it was not fairly
        debatable given the opinion of Mr. Skelcy's treating specialist, a
        rheumatologist with a positive history in analyzing and successfully
        navigating Mr. Skelcy's condition;

aa)     denying the requested IVIG treatment where it was not fairly debatable
        given the opinion of Mr. Skelcy's treating specialist, a rheumatologist
        with a positive history in analyzing and successfully navigating Mr.
        Skelcy's condition.

bb)     denying and delaying a valid claim which was not fairly debatable by
        requesting claim history records that should reasonably be accessible
        or kept by UnitedHealth;

cc)     denying and delaying a valid and medically necessary claim where Dr.
        Sandoval knew, or should have known, as an ophthalmologist, that he
        lacked the requisite knowledge to competently review a
        rheumatologically based claim;

dd)     tainting the peer review assessment by transmitting a narrative comment
        drafted by Dr. Wilder to MES Solutions for consideration in Mr.
        Skelcy's claim.  The comment stated "[t]he literature has some reports
        in PubMed that Rituxan is effective for this conition (sic) but it is not
        the standard of care and it is not listed in Micromedex with a
        recommendation. Please review with this comment in mind and also

- 58 -

that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

ee)   tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

ff)   failing to communicate, at anytime, approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

gg)   failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

hh)   failing to provide Mr. Skelcy's treating rheumatologist with reasonable access to UnitedHealth's clinical peer reviewer as required by the insurance contract at issue;

ii)   failing to conclude Mr. Skelcy's expedited appeal, subsequent to receipt of all necessary information, within the timeframes set forth in the insurance agreement at issue and as specified by New Jersey law;

jj)   failing to initiate and employ a specialty case management plan for Mr. Skelcy, as defined by the insurance contract at issue;

kk)   violating their fiduciary duty to the patient by not acting in the patient's interest within the bounds of the insurance contract;

ll)   failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

mm)   not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to understand the nature of the drug, Rituxan;

nn)   not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

oo)   not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

- 59 -

pp)   not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research standard off-label uses of Rituxan, thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity with standard uses of the drug;

qq)   not exercising or exhibiting reasonable skill, care and knowledge of a medical professional in the health insurance claim industry by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan, thereby causing Mr. Skelcy to detrimentally rely upon the reasonable supposition of his insurers familiarity of said industry studies and literature;

rr)   denying a medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

ss)   wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis;

tt)   delaying and not properly or promptly adjusting the denial upon receipt of "office notes detailing the medical necessity of CPT code J9310 for dx 710.3" as requested;

uu)   delaying/denying approval after the treating rheumatologist accurately provided records, including but not limited to, all records requested by the insurance company; records detailing imminence; records detailing necessity; and records detailing proven use of the drug Rituxan for the clinical diagnosis;

vv)   failing to accept a reasonable statement by a professional medical doctor that a medication was imminently necessary to treat Mr. Skelcy;

ww)   failing to acknowledge the increased risk of harm a denial of treatment would cause Mr. Skelcy;

xx)   failing to acknowledge the increased risk of harm a delay in treatment would cause Mr. Skelcy;

yy)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

zz)   assuming a duty in approving initial doses of Rituxan in August and September of 2009 and then refusing to permit maintenance doses as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, as is the usual course of Rituxan therapy;

aaa)   approving Rituxan therapy in August and September of 2009 and causing Mr. Skelcy's treating physicians to detrimentally rely on the continued use, availability and coverage of this treatment;

bbb)   denying and delaying treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

ccc)   wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

ddd)   wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

164.   As a direct and proximate result of the unfair claims practices and/or bad faith of the Defendants, Gail Wilder M.D. and Dennis Sandoval M.D., individually and as employees/agents of UnitedHealth, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

165.   The harmed suffered by Mr. Skelcy was the result of these Defendant's acts and/or omissions, both jointly and independently, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, these Defendants are liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

166.     The Defendants are liable to the Plaintiff via Decedent's wrongful death pursuant to the common law remedies regarding bad faith claims practices, including, but not limited to punitive damages and foreseeable consequential damages.

167.     The Defendants are liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

168.     The Defendants are liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendants, Gail Wilder M.D. and Dennis Sandoval M.D., individually and as employees/agents of UnitedHealth, for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

## COUNT VIII: NEGLIGENCE

### (Estate of James T. Skelcy v. Denise Beighe, M.D., individually and as an employee/agent of Medical Evaluations Specialists, Inc.)

169.     Plaintiff incorporates by reference paragraphs 1-168 as though fully set forth herein.

170.     On or about July 15, 2010, Dr. Beighe received documents relevant to Mr. Skelcy's medical claim for purposes of conducting a "peer review assessment".

171.     Dr. Beighe was assigned Mr. Skelcy's case (MES Case #31810087934) through her agency relationship with Defendant, MES Solutions.

172.     Absent from the documents transmitted from UnitedHealth to MES Solutions and Dr. Beighe were the standards of prescription drug coverage applicable to Mr. Skelcy's claim as defined in Section VIII, subsection "Prescription Drugs" of the insurance policy and as delineated by N.J.S.A. 17B:26-2.1(g).

173.     In her peer review assessment on or about July 16, 2010, Dr. Beighe notes Mr. Skelcy previously received Rituxan in "8/2009" and reported feeling well with correspondingly normal lab results.

174.     Dr. Beighe further noted that in the two laboratory results immediately prior to her review, Mr. Skelcy's "LFTs (liver function tests) were increased…very elevated CK and aldolase."  Dr. Beighe further noted that Mr. Skelcy "now had weakness and shortness of breath" and recognized that the treating rheumatologist communicated the need of "Rituxan or IVIG."

175.     Dr. Beighe concluded her peer review assessment that "[t]his type of therapy is not standard of care for this disease" and "[t]his specific therapy is not standard of care for this patient's disease". Dr. Beighe further specified that there was inadequate medical literature to conclude that Rituxan was effective in treating Mr. Skelcy's condition.

176.     In or about July of 2010, Defendant, Dr. Beighe, was negligent in reviewing, denying and delaying the proper and necessary treatment of Mr. Skelcy's condition and failed to exercise the ordinary care and diligence of a medical professional tasked with review of health insurance claims, with due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

- 63 -

a)      wrongfully determining Mr. Skelcy should not have access to medically necessary treatment;

b)      wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

c)      wrongfully determining Mr. Skelcy should not have access to treatment which was proven to be effective for his condition;

d)      failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

e)      failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

f)      failing to provide a specific reasonable basis for denying the claim exclusive of an exceedingly generalized category of denial;

g)      failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

h)      failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

i)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to Dr. Beighe through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

j)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Beighe given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to her;

k)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Beighe given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to her;

l)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been,

immediately apparent to Dr. Beighe given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to her;

m)      wrongfully determining Mr. Skelcy should not have access to the requested  Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

n)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

o)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

p)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

q)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

r)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

s)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

t)      tainting the peer review assessment by considering a narrative comment drafted by Dr. Wilder as to how to conclude the assessment.  The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

- 65 -

u)      tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

v)      failing to research the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

w)     failing to research the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

x)      failing to apply the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

y)      failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

z)      failing to communicate approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

aa)     failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

bb)     failing to communicate with Mr. Skelcy's treating rheumatologist as a clinical peer reviewer in reviewing this claim, pursuant to the insurance contract at issue;

cc)     failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

dd)     not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry, by failing to understand the nature of the drug, Rituxan;

ee)     not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry, by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

ff)     not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry, by failing to know or research typical patient

- 66 -

responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

gg)  not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry by failing to know or research standard off-label uses of Rituxan;

hh)  not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan;

ii)  wrongfully determining Mr. Skelcy should not have access to medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

jj)  wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis;

kk)  wrongfully determining Mr. Skelcy should not have access to medically necessary treatment after the treating rheumatologist accurately provided records, including but not limited to, all records requested by the insurance company; records detailing imminence; records detailing necessity; and records detailing proven use of the drug Rituxan for the clinical diagnosis;

ll)  failing to accept a reasonable statement by a professional medical doctor that a medication was imminently necessary to treat Mr. Skelcy;

mm)  failing to acknowledge the increased risk of harm her determination that Mr. Skelcy should not have access to medically necessary treatment would cause;

nn)  recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance doses were improper, as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

oo)  recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance doses were improper in July 2010, as is the usual course of Rituxan therapy;

- 67 -

pp)   wrongfully determining Mr. Skelcy should not have access to treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

qq)   wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

rr)   wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

177.   As a direct and proximate result of the negligence, gross negligence, and/or recklessness of the Defendant, Denise Beighe M.D., individually and as an employee/agent of Defendant, MES Solutions, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

178.   The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

179.   The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

180.   The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendant, Denise Beighe M.D., individually and as an employee/agent of Defendant, MES Solutions, for the

wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

### COUNT IX: NEGLIGENCE PER SE

**(Estate of James T. Skelcy v. Denise Beighe, M.D., individually and as an employee/agent of Medical Evaluations Specialists, Inc.)**

181.     Plaintiff incorporates by reference paragraphs 1-180 as though fully set forth herein.

182.     In or about July of 2010, Dr. Beighe knew, or should have known, that Mr. Skelcy medical insurance claim originated in New Jersey, pursuant to an insurance agreement governed by the State of New Jersey and was for treatment in the State of New Jersey.

183.      In or about July of 2010, Dr. Beighe knew, or should have known, that New Jersey law governing prescription drug coverage applied to Mr. Skelcy's medical insurance claim.

184.     More specifically, N.J.S.A. 17B:26-2.1(g) is applicable to the policy of insurance at issue in the within matter.

185.     N.J.S.A. 17B:26-2.1(g) requires health insurers to provide coverage for expenses incurred in prescribing a drug for a treatment for which it has not been approved by the Food and Drug Administration if the drug is recognized as being medically appropriate for the specific type of treatment for which the drug has been prescribed in one of the following established reference compendia: (1) the American Medical Association Drug Evaluations; (2) the American Hospital Formulary Service

Drug Information; (3) the United States Pharmacopoeia Drug Information; or, it is

recommended by a clinical study or review article in a major-peer reviewed professional

journal.

186.     In or about July of 2010, Defendant, Dr. Beighe was negligent per se in

reviewing, denying and delaying the proper and necessary treatment of Mr. Skelcy's

condition and failed to exercise the ordinary care and diligence of a medical professional

tasked with review of health insurance claims, with due regard to the safety, well-being,

and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the

following:

    a)     wrongfully determining Mr. Skelcy should not have access to
           medically necessary treatment;

    b)     wrongfully delaying Mr. Skelcy's access to medically necessary
           treatment;

    c)     wrongfully determining Mr. Skelcy should not have access to
           treatment which was proven to be effective for his condition;

    d)     failing to understand and appreciate the nature and condition of the
           patient's primary diagnosis, resistant dermatomyositis, and its
           complications;

    e)     failing to understand and appreciate the nature and condition of the
           patient's secondary diagnosis, ILD, and its complications;

    f)     failing to provide a specific reasonable basis for denying the claim
           exclusive of an exceedingly generalized category of denial;

    g)     failing to research and adequately assess Mr. Skelcy's previous
           treatment history, including but not limited to, the his excellent
           response to a previous Rituxan treatment that was covered under the
           same or similar insurance policy of UnitedHealth;

    h)     failing to review and adequately assess the relevant parts of Mr.
           Skelcy's claim history;

    i)     failing to appreciate the imminence of Mr. Skelcy's condition and
           dangerousness of delaying treatment which was conveyed to Dr.
           Beighe through the treating rheumatologist's pronounced and

- 70 -

conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

j) failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Beighe given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to her;

k) failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Beighe given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to her;

l) failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to Dr. Beighe given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to her;

m) wrongfully determining Mr. Skelcy should not have access to the requested  Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

n) wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

o) wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

p) wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

q) wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

r)   wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

s)   wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

t)   tainting the peer review assessment by considering a narrative comment drafted by Dr. Wilder as to how to conclude the assessment. The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

u)   tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

v)   failing to research the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

w)   failing to research the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

x)   failing to apply the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

y)   failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

z)   failing to make a determination within the mandates of N.J.S.A. 17B:26-2.1(g);

aa)   failing to approve therapy requested pursuant to the mandates of N.J.S.A. 17B:26-2.1(g);

bb)   failing to communicate approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

cc) failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

dd) failing to communicate with Mr. Skelcy's treating rheumatologist as a clinical peer reviewer in reviewing this claim, pursuant to the insurance contract at issue;

ee) failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

ff) not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry, by failing to understand the nature of the drug, Rituxan;

gg) not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry, by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

hh) not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry, by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

ii) not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry by failing to know or research standard off-label uses of Rituxan;

jj) not exercising or exhibiting reasonable skill, care and knowledge of a medical professional providing peer review assessments in the health insurance claim industry by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan;

kk) wrongfully determining Mr. Skelcy should not have access to medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

ll) wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis;

mm)    wrongfully determining Mr. Skelcy should not have access to medically necessary treatment after the treating rheumatologist accurately provided records, including but not limited to, all records requested by the insurance company; records detailing imminence; records detailing necessity; and records detailing proven use of the drug Rituxan for the clinical diagnosis;

nn)    failing to accept a reasonable statement by a professional medical doctor that a medication was imminently necessary to treat Mr. Skelcy;

oo)    failing to acknowledge the increased risk of harm her determination that Mr. Skelcy should not have access to medically necessary treatment would cause;

pp)    recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance doses were improper, as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

qq)    recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance doses were improper in July 2010, as is the usual course of Rituxan therapy;

rr)    wrongfully determining Mr. Skelcy should not have access to treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

ss)    wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

tt)    wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

187.    Mr. Skelcy, as an insured, was in the class of persons designed to be protected and/or suffered the type of harm the above referenced statutes were designed to prevent.

188.    As a direct and proximate result of the negligence per se of the Defendant, Denise Beighe M.D., individually and as an employee/agent of Defendant, MES Solutions, Mr. Skelcy was caused serious, irreversible injuries, including an acute

exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

189.     The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

190.     The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

191.     The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendant, Denise Beighe M.D., individually and as an employee/agent of Defendant, MES Solutions, for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

## COUNT X: NEGLIGENCE

### (Estate of James T. Skelcy v. Medical Evaluations Specialists, Inc.)

192.     Plaintiff incorporates by reference paragraphs 1-191 as though fully set forth herein.

- 75 -

193.      On or about July 15, 2010, Defendant, MES Solutions, received documents relevant to Mr. Skelcy's medical claim for purposes of conducting a "peer review assessment".

194.      MES Solutions assigned Dr. Beighe to conduct the peer review assessment of Mr. Skelcy's medical insurance claim (MES Case #31810087934).

195.      Dr. Beighe had previously conducted peer review assessments on behalf of MES Solutions, prior to reviewing Mr. Skelcy's matter.

196.      Absent from the documents transmitted from UnitedHealth to MES Solutions and Dr. Beighe were the standards of prescription drug coverage applicable to Mr. Skelcy's claim as defined in Section VIII, subsection "Prescription Drugs" of the insurance policy and as delineated by N.J.S.A. 17B:26-2.1(g).

197.      In or about July of 2010, Defendant, MES Solutions, was negligent in assigning, reviewing, denying and delaying the proper and necessary treatment of Mr. Skelcy's condition and failed to exercise the ordinary care and diligence of an organization in the business of providing peer review assessments in the health insurance claim industry, with due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

a)      failing to research the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

b)      failing to apprise Dr. Beighe, its employee/agent, of the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

c)      failing to research the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

d)      failing to apprise Dr. Beighe, its employee/agent, of the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

e)      failing to make a determination within the mandates of N.J.S.A. 17B:26-2.1(g);

f)      failing to approve therapy requested pursuant to the mandates of N.J.S.A. 17B:26-2.1(g);

g)      failing to apply the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

h)      failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

i)      wrongfully determining Mr. Skelcy should not have access to medically necessary treatment;

j)      wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

k)      wrongfully determining Mr. Skelcy should not have access to treatment which was proven to be effective for his condition;

l)      failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

m)      failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

n)      failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

o)      failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

p)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to Dr. Beighe through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

q)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to MES Solutions given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the

- 77 -

letter of medical necessity and corroborated in the records transmitted to MES Solutions;

r)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to MES Solutions given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to MES Solutions;

s)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to MES Solutions given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to MES Solutions;

t)      wrongfully determining Mr. Skelcy should not have access to the requested  Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

u)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

v)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

w)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

x)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

y)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

z) wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

aa) tainting the peer review assessment by considering a narrative comment drafted by Dr. Wilder as to how to conclude the assessment.  The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

bb) tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

cc) failing to communicate approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

dd) failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

ee) failing to communicate with Mr. Skelcy's treating rheumatologist as a clinical peer reviewer in reviewing this claim, pursuant to the insurance contract at issue;

ff) failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

gg) not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to understand the nature of the drug, Rituxan;

hh) not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

ii) not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in

the health insurance claim industry, by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

jj)     not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to know or research standard off-label uses of Rituxan;

kk)    not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan;

ll)     wrongfully determining Mr. Skelcy should not have access to medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

mm)   wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis;

nn)    wrongfully determining Mr. Skelcy should not have access to medically necessary treatment after the treating rheumatologist accurately provided records, including but not limited to, all records requested by the insurance company; records detailing imminence; records detailing necessity; and records detailing proven use of the drug Rituxan for the clinical diagnosis;

oo)    failing to accept a reasonable statement by a professional medical doctor that a medication was imminently necessary to treat Mr. Skelcy;

pp)    failing to acknowledge the increased risk of harm MES Solution's determination that Mr. Skelcy should not have access to medically necessary treatment would cause;

qq)    recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance doses were improper, as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

rr)     recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance

doses were improper in July 2010, as is the usual course of Rituxan therapy;

ss)   wrongfully determining Mr. Skelcy should not have access to treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

tt)   wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

uu)   wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

198.   As a direct and proximate result of the negligence, gross negligence, and/or recklessness of the Defendant, MES Solutions,  Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted, prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

199.   The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

200.   The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of N.J.S.A. 2A:15-3.

201.   The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as N.J.S.A. 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendant, MES Solutions, for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

### COUNT XI: NEGLIGENCE PER SE

### (Estate of James T. Skelcy v. Medical Evaluations Specialists, Inc.)

202.     Plaintiff incorporates by reference paragraphs 1-201 as though fully set forth herein.

203.     In or about July of 2010, Defendant, MES Solutions knew, or should have known, that Mr. Skelcy medical insurance claim originated in New Jersey, pursuant to an insurance agreement governed by the State of New Jersey and was for treatment in the State of New Jersey.

204.      In or about July of 2010, MES Solutions knew, or should have known, that New Jersey law governing prescription drug coverage applied to Mr. Skelcy's medical insurance claim.

205.     More specifically, N.J.S.A. 17B:26-2.1(g) is applicable to the policy of insurance at issue in the within matter.

206.     N.J.S.A. 17B:26-2.1(g) requires health insurers to provide coverage for expenses incurred in prescribing a drug for a treatment for which it has not been approved by the Food and Drug Administration if the drug is recognized as being medically appropriate for the specific type of treatment for which the drug has been

prescribed in one of the following established reference compendia: (1) the American Medical Association Drug Evaluations; (2) the American Hospital Formulary Service Drug Information; (3) the United States Pharmacopoeia Drug Information; or, it is recommended by a clinical study or review article in a major-peer reviewed professional journal.

207.     In or about July of 2010, Defendant, MES Solutions was negligent per se in assigning, reviewing, denying and delaying the proper and necessary treatment of Mr. Skelcy's condition and failed to exercise the ordinary care and diligence of an organization in the business of providing peer review assessments in the health insurance claim industry, with due regard to the safety, well-being, and rights of Mr. Skelcy, which acts and/or omissions included, but were not limited to, the following:

a)     failing to research the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

b)     failing to apprise Dr. Beighe, its employee/agent, of the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

c)     failing to research the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

d)     failing to apprise Dr. Beighe, its employee/agent, of the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

e)     failing to apply the correct review standard for the claim as outlined in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue;

f)     failing to apply the correct review standard for the claim as delineated by N.J.S.A. 17B:26-2.1(g);

g)     wrongfully determining Mr. Skelcy should not have access to medically necessary treatment;

h)      wrongfully delaying Mr. Skelcy's access to medically necessary treatment;

i)      wrongfully determining Mr. Skelcy should not have access to treatment which was proven to be effective for his condition;

j)      failing to understand and appreciate the nature and condition of the patient's primary diagnosis, resistant dermatomyositis, and its complications;

k)      failing to understand and appreciate the nature and condition of the patient's secondary diagnosis, ILD, and its complications;

l)      failing to research and adequately assess Mr. Skelcy's previous treatment history, including but not limited to, the his excellent response to a previous Rituxan treatment that was covered under the same or similar insurance policy of UnitedHealth;

m)      failing to review and adequately assess the relevant parts of Mr. Skelcy's claim history;

n)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was conveyed to Dr. Beighe through the treating rheumatologist's pronounced and conspicuous notation of the word "STAT," which in common medical vernacular indicates immediacy and requires attention;

o)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to MES Solutions given Mr. Skelcy's diagnosis and history of dermatomyositis and ILD, as conveyed through the letter of medical necessity and corroborated in the records transmitted to MES Solutions;

p)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to MES Solutions given Mr. Skelcy's worsening condition as demonstrated through his elevated creatine kinase levels, aldolase levels and liver enzymes, conveyed through the letter of medical necessity and as corroborated in the records transmitted to MES Solutions;

q)      failing to appreciate the imminence of Mr. Skelcy's condition and dangerousness of delaying treatment which was, or should have been, immediately apparent to MES Solutions given Mr. Skelcy's presenting symptomology, including weakness and shortness of breath, conveyed through the letter of medical necessity and as corroborated in the records transmitted to MES Solutions;

r)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the refractory nature of Mr. Skelcy condition to first line therapies;

s)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the prior approval of UnitedHealth approximately one year prior;

t)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given Mr. Skelcy's excellent response to the drug approximately one year prior and achievement of complete resolution of symptoms;

u)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the approval and administration of the drug approximately one year prior and the medical presumption that a maintenance dose will be required in the future when/if symptomology returns;

v)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the presenting symptomology, laboratory results and imminency of Mr. Skelcy's condition as of July 2010;

w)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the supporting medical literature for myositis patients as of July 2010, particularly resistant myositis patients such as Mr. Skelcy;

x)      wrongfully determining Mr. Skelcy should not have access to the requested Rituxan treatment where it was medically necessary given the opinion of Mr. Skelcy's treating specialist, a rheumatologist with a positive history in analyzing and successfully navigating Mr. Skelcy's condition;

y)      tainting the peer review assessment by considering a narrative comment drafted by Dr. Wilder as to how to conclude the assessment.  The comment stated "[t]he literature has some reports in PubMed that Rituxan is effective for this conition (sic) but it is not the standard of care and it is not listed in Micromedex with a recommendation. Please review with this comment in mind and also that the patient had a response to Rituxan in the past. Ivig is also mention (sic) by the physician as an alternative."

z)      tainting the peer review assessment by failing to frame the claim issues within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

aa)    failing to communicate approval or consideration of IVIG treatment to Mr. Skelcy or his treating rheumatologist;

bb)    failing to review coverage within the applicable standards as found in Section VIII, subsection "Prescription Drugs" of the insurance contract at issue and as delineated by N.J.S.A. 17B:26-2.1(g);

cc)    failing to communicate with Mr. Skelcy's treating rheumatologist as a clinical peer reviewer in reviewing this claim, pursuant to the insurance contract at issue;

dd)    failing to review and adequately assess the documentation of medical necessity and imminent need of treatment submitted by the treating physician;

ee)    not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to understand the nature of the drug, Rituxan;

ff)    not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to know or research industry studies showing effectiveness of Rituxan in treating resistant dermatomyositis;

gg)    not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to know or research typical patient responses to Rituxan and recognizing Mr. Skelcy's exceedingly positive response to the drug in August of 2009;

hh)    not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to know or research standard off-label uses of Rituxan;

ii)    not exercising or exhibiting reasonable skill, care and knowledge of a organization in the business of providing peer review assessments in the health insurance claim industry, by failing to know or research the pertinent clinical studies or review articles in major-peer reviewed professional journals on the treatment of dermatomyositis with Rituxan;

jj)    wrongfully determining Mr. Skelcy should not have access to medically necessary treatment despite the existence of numerous supportive clinical studies or review articles in major peer-reviewed professional journals;

kk)     wrongfully shifting the burden upon the treating rheumatologist to prove the industry recognition of the efficacy of Rituxan in treating dermatomyositis;

ll)     wrongfully determining Mr. Skelcy should not have access to medically necessary treatment after the treating rheumatologist accurately provided records, including but not limited to, all records requested by the insurance company; records detailing imminence; records detailing necessity; and records detailing proven use of the drug Rituxan for the clinical diagnosis;

mm)     failing to accept a reasonable statement by a professional medical doctor that a medication was imminently necessary to treat Mr. Skelcy;

nn)     failing to acknowledge the increased risk of harm MES Solution's determination that Mr. Skelcy should not have access to medically necessary treatment would cause;

oo)     recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance doses were improper, as Mr. Skelcy imminently required in the usual course of this drug therapy in July 2010, thereby placing Mr. Skelcy in a worse position than before any treatment with Rituxan occurred;

pp)     recognizing that Mr. Skelcy received initial doses of Rituxan in August and September of 2009 and then determining that maintenance doses were improper in July 2010, as is the usual course of Rituxan therapy;

qq)     wrongfully determining Mr. Skelcy should not have access to treatment that the treating rheumatologist and Mr. Skelcy relied upon to assure his safety, health, and well-being;

rr)     wrongfully weighing human life against the financial burden of providing contracted for medical benefits; and

ss)     wrongfully causing Mr. Skelcy's medical condition to escalate without intervention, despite a known effective treatment, which led to his death.

208.     As a direct and proximate result of the negligence per se of the Defendant, MES Solutions, Mr. Skelcy was caused serious, irreversible injuries, including an acute exacerbation of his dermatomyositis and ILD, and further, was caused to be inflicted,

prior to his death, with extreme pain and suffering and extreme severe emotional stress and trauma.

209.     Mr. Skelcy, as an insured, was in the class of persons designed to be protected and/or suffered the type of harm the above referenced statutes were designed to prevent.

210.     The harmed suffered by Mr. Skelcy was the result of this Defendant's acts and/or omissions, and such acts and/or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of the foreseeable risk to Mr. Skelcy's health and safety.  Therefore, the Defendant is liable to the Plaintiff pursuant to the dictates of the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.9, et seq.

211.     The Defendant is liable to the Plaintiff via Decedent's wrongful death pursuant to the dictates of <u>N.J.S.A.</u> 2A:15-3.

212.     The Defendant is liable to the Plaintiff due to the wrongful death of the Decedent by the State of New Jersey Wrongful Death Statute known and designated as <u>N.J.S.A.</u> 2A:31-1, et seq.

WHEREFORE, Plaintiff demand judgment against the Defendant, MES Solutions, for the wrongful death of the Decedent, James T. Skelcy, for such damages as would reasonably and properly compensate in accordance with the laws of the State of New Jersey, together with punitive damages, interest and costs of suit.

## **JURY DEMAND**

The Plaintiff hereby demands a trial by jury as to all issues of the within matter.

- 88 -

RUSSO LAW OFFICES, LLC


By:     s/Brad M. Russo, Esq.
BRAD M. RUSSO
Attorney for Plaintiff
633 Belvidere Road
Phillipsburg, NJ 08865
(908)454-0806

Dated:  February 17, 2012